## BARBER v. SCHELL.

## SCHELL v. BARBER.

1. By schedule D of the act of July 30, 1846, c. 74, a duty of twenty-five per cent *ad valorem* was imposed on " cotton laces, cotton insertings," and " manufactures composed wholly of cotton, not otherwise provided for."  By sect. 1 of the act of March 3, 1857, c. 98, the duties on the articles enumerated in schedules C and D of the act of 1846 were fixed at twenty-four and nineteen per cent, respectively, " with such exceptions as are hereinafter made."  By sect. 2 of the act of 1857, " all manufactures composed wholly of cotton, which are bleached, printed, painted, or dyed, and delaines," were transferred to schedule C.  *Held*, that laces and insertings composed wholly of cotton, and bleached or dyed, were dutiable at twenty-four per cent, under the act of 1857.

2. The designations qualified by the word " cotton," in the act of 1846, are designations of articles by special description, as contradistinguished from designations by a commercial name or a name of trade, and are designations of quality and material.

3. Under the act of March 2, 1799, c. 23, the collector of customs is not entitled to a fee for putting on an invoice a stamp or certificate as to the presentation of the invoice, or for an oath to an entry or for a jurat to such oath, or for his order to the storekeeper to deliver examined packages.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*The Solicitor-General* for Schell.

*Mr. George Bliss, contra.*

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit commenced in 1863, by the members of the firm of S. Cochran & Co., against the collector of the port of New York.  As tried in the Circuit Court it involved the recovery back of duties paid on cotton laces and cotton insertings imported from abroad in 1857, 1858, 1859, 1860, and 1861, and of fees paid at the custom-house.  The laces and insertings were composed wholly of cotton, and were " either bleached or dyed."  The collector charged a duty on them of twenty-four per cent *ad valorem*, the importers claiming that the proper duty was nineteen per cent *ad valorem*.  At the trial the court

instructed the jury that the duty was correctly assessed and that the plaintiffs could not recover.

The question as to the fees involved four items. On the presentation of an invoice and an entry, the collector, before he would receive them as collector, impressed on each invoice, for the convenience and security of himself and the government, a stamp or certificate, certifying in the name of a deputy collector that the invoice was presented "on entry" on such a day. On each entry, one of the plaintiffs was required to make and subscribe before the collector or his deputy the owner's or consignee's oath. For each of such stamps the collector exacted twenty cents, and for each of such oaths twenty cents. He also exacted a fee of twenty cents for each permit to land the merchandise embraced in each entry on which the duties had been paid or secured, such permit being signed by the collector and the naval officer. Said three fees of twenty cents were paid with the duties, and otherwise no permit for the landing and delivery of the goods could be obtained. The permit to land covered all the goods embraced in the entry; but at least one package of each invoice, and one package in every ten packages of each invoice, were, by order of the collector, designated on each invoice, and each entry, and also on the permit, to be sent, and were sent, to the public store for examination and appraisement; and, after they had been examined and appraised and reported on, an order was required by the plaintiffs' firm, signed by the collector alone, to the storekeeeper, to deliver such examined packages to the plaintiffs' firm. For every such order, without which the examined packages could not be obtained, the collector exacted a fee of twenty cents. At the trial, the plaintiffs conceded that the fee for the permit was legal. The court directed a verdict for the plaintiffs for the amounts exacted for the other three fees, with interest, being $1,734.80, and, after a judgment for the plaintiffs therefor, with costs, the plaintiffs sued out a writ of error based on their failure to recover the alleged excess of duty exacted on the laces and insertings, and the defendant sued out a writ of error based on the recovery for the three alleged illegal fees.

By schedule D of the act of July 30, 1846, c. 74, a duty of twenty-five per cent *ad valorem* was imposed on " cotton laces,

cotton insertings, cotton trimming laces, cotton laces and braids," and "manufactures composed wholly of cotton, not otherwise provided for."

By sect. 1 of the act of March 3, 1857, c. 98, it was enacted that after July 1, 1857, *ad valorem* duties should be imposed in lieu of those then imposed on imported goods, as follows: "Upon the articles enumerated in schedules A and B" of the tariff act of 1846, a duty of thirty per cent, "and upon those enumerated in schedules C, D, E, F, G, and H of said act," the duties of twenty-four, nineteen, fifteen, twelve, eight, and four per cent, respectively, "with such exceptions as are hereinafter made." The schedules above mentioned respectively imposed duties of one hundred, forty, thirty, twenty-five, twenty, fifteen, ten, and five per cent.

Thus far cotton laces and cotton insertings, being in schedule D of the act of 1846 at twenty-five per cent, were reduced by the act of 1857, with the other articles in schedule D, to nineteen per cent. But sect. 2 of the act of 1857 provided "that all manufactures composed wholly of cotton, which are bleached, printed, painted, or dyed, and delaines, shall be transferred to schedule C." Under this provision it would seem very plain that the goods in the present case were subject to a duty of twenty-four per cent, and not of nineteen per cent. If sect. 1 of the act of 1857 had merely reduced from twenty-five per cent to nineteen per cent the duty on the articles specially mentioned in schedule D of the act of 1846, without exception, the duty on the goods in question would have been reduced to nineteen per cent. But the enactment was distinct that there should be excepted out of the reduction "all manufactures composed wholly of cotton, which are bleached, printed, painted, or dyed, and delaines," and that they should go into schedule C, the twenty-four per cent schedule.

The contention for the plaintiffs is, that as cotton laces and cotton insertings were made dutiable by those names in the act of 1846, they are not to be affected by the subsequent general provision as to manufactures composed wholly of cotton.

Schedule C of the act of 1846 imposed a duty of thirty per cent on "cotton cords, gimps and galloons," and on "manufactures of cotton, . . . if embroidered or tamboured in the loom,

or otherwise, by machinery, or with the needle, or other process." Schedule E imposed a duty of twenty per cent on "caps, gloves, leggins, mits, socks, stockings, wove shirts and drawers, made on frames, composed wholly of cotton, worn by men, women, and children," and on "velvet, in the piece, composed wholly of cotton." These provisions, and the one in schedule D as to cotton laces, &c., relate to goods made of cotton entirely. Those goods are all of them goods to which, as "manufactures composed wholly of cotton," sect. 2 of the act of 1857 applies, transferring them, when bleached, printed, painted, or dyed, to the twenty-four per cent schedule, schedule C. The duty on them had been thirty, twenty-five, and twenty per cent respectively. But for such transfer the new duty on those in schedules D and E would have been nineteen and fifteen. A new uniform rate of twenty-four was imposed, and while the thirty was reduced by six per cent, the twenty-five was reduced by only one, and the twenty was increased by four. This indicates an intention, in the act of 1857, to impose, in general, on manufactures composed wholly of cotton, when bleached, printed, painted, or dyed, a relatively higher duty as compared with other articles named in the act of 1846.

The expression "manufactures composed wholly of cotton" is not found in the act of 1846. It is in that act qualified by the words "not otherwise provided for." In the act of 1857 the expression is, "all manufactures composed wholly of cotton, which are bleached," &c. If the words "manufactures composed wholly of cotton," unqualified, and the words "cotton laces" and "cotton insertings," had all of them been found in the act of 1846, as the general expression would not have embraced the specific terms in that act, for dutiable purposes, though including them in general language, it would be reasonable to say that the general expression in a later act would not include the specific terms for dutiable purposes. But the fact that the general expression, as used in schedule D of the act of 1846, is qualified by the words "not otherwise provided for," shows that there were manufactures composed wholly of cotton otherwise provided for, that is, in other items in that act. Thus, besides the embroidered and tamboured manufactures of cotton provided for in schedule C of that act, there are cords,

gimps, galloons, laces, insertings, trimming laces, laces and braids, each with the word " cotton " prefixed, indicating manufactures composed wholly of cotton, and there are also the articles composed wholly of cotton named in schedule E. The material " cotton " is the thing of special mark, as the sole material in the manufacture. In this view it cannot properly be said that these manufactured articles, manufactures of cotton composed wholly of cotton, designated in the act of 1846 always by the epithet " cotton " applied to them, are not embraced, for dutiable purposes, in the terms " all manufactures composed wholly of cotton," in sect. 2 of the act of 1857.

The designations qualified by the word " cotton," in the act of 1846, are designations of articles by special description, as contradistinguished from designations by a commercial name or a name of trade. They are designations of quality and material. The articles referred to, named in schedules C, D, and E of the act of 1846, are all of them manufactures wholly of cotton; but under that act they were not all subject to the same duty, and so that act designates them substantially as manufactures wholly of cotton which are gimps at thirty per cent, manufactures wholly of cotton which are laces or insertings at twenty-five per cent, manufactures wholly of cotton which are stockings, made on frames and worn by human beings, at twenty per cent, and so on. But for the exceptions provided for by sect. 1 of the act of 1857 the duties on those articles, if bleached, printed, painted, or dyed, would have been reduced to twenty-four, nineteen, and fifteen per cent, respectively; but sect. 2 of that act says, in substance, that manufactures wholly of cotton which are gimps, or laces, or insertings, or stockings, and so on, shall, all of them, be subject to twenty-four per cent duty. This was the view applied by Mr. Justice Nelson, in *Reimer* v. *Schell*, 4 Blatchf. 328, in 1859, to colored cotton hosiery, under the provisions in question, and we think it a sound one. It was the view adopted by the Circuit Court in this case. There is no question of commercial designation. Hence, the cases cited and relied on by the importers are not in their favor.

*Homer* v. *The Collector*, 1 Wall. 486, in 1863, was a case in which Mr. Justice Nelson delivered the opinion of this court.

It was a case under these same statutes. Almonds were dutiable, by that name, at forty per cent, in schedule B of the act of 1846. Under the act of 1857 the duty on the articles in said schedule B was reduced to and fixed at thirty per cent, and the collector exacted that duty on almonds. · It was contended that as, by sect. 2 of the latter act, "fruits, green, ripe, or dried," were transferred to schedule G, and so made subject to only eight per cent duty, almonds were so transferred, as being "fruits, green, ripe, or dried." An attempt was made, at the trial, to show that, at the time the act of 1857 was passed, almonds were fruit, green, ripe, or dried, according to the commercial understanding of those terms in the markets of this country, and questions were certified to this court, on a division of opinion in the Circuit Court, as to the proper duty on almonds, and as to the admissibility of such evidence. It was contended, for the importer, that the term "dried fruits," in popular meaning, included almonds. The government claimed that the term "almonds" was a specific name, and, therefore, commercial nomenclature had no application. This court held that inquiry as to whether, in a commercial sense, almonds were dried fruit, had nothing to do with the question, as a duty had been imposed on almonds, *eo nomine,* almost immemorially; and that, as almonds were charged specifically with a duty of forty per cent in the act of 1846, and were not named as almonds in the changes in the act of 1857, and full effect could be given to the term "fruit, dried," without including almonds in it, it followed that almonds were dutiable at thirty per cent. There is nothing in this decision that overrules that in *Reimer* v. *Schell,* or that aids the importers in the present case. The act of 1846, in substance, mentions manufactures wholly of cotton which are laces or insertings, bleached or dyed, and sect. 2 of the act of 1857 mentions them in naming manufactures composed wholly of cotton, bleached or dyed.

Nor does the case of *Reiche* v. *Smythe,* 13 Wall. 162, as to birds, apply. That case was decided on the ground that the word "animals," in the act of 1861, did not include "birds," and so could not include them in the act of 1866.

There is nothing in *Smythe* v. *Fiske,* 23 id. 374, or in *Arthur* v. *Morrison,* 96 U. S. 108, which applies to this case.

*Movius* v. *Arthur*, 95 U. S. 144, was decided on the same view as *Homer* v. *The Collector.* " Patent leather " had been dutiable by that name in the acts of 1861 and 1862. The act of 1872 imposed a less duty on " skins dressed and finished, of all kinds." This court held that patent leather continued subject to the former duty, on the view that, although patent leather was a finished skin, something was done to it after it could be called a finished skin to make patent leather of it, and that it could not have been intended to include patent leather in the general designation of " finished skins."

In *Arthur* v. *Lahey*, 96 id. 112, the subject of duty was laces, manufactures of silk, on which a duty of sixty per cent was exacted, under the act of 1864, as " silk laces." It was contended that they were dutiable at thirty per cent, as " thread laces," under the act of 1861, as amended by the act of 1862. The question being submitted to the jury whether they were commercially known as " thread laces," although made of silk, it was found that they were, and the plaintiffs had a verdict. This court held that the question was one of commercial designation, and that the prior specific designation of " thread laces " must prevail over the words " silk laces," it appearing that there were thread laces of cotton and thread laces of silk, and articles commercially known as silk laces, the designation of " thread lace " depending on the mode of manufacture. The principle of that case, and of kindred cases, such as *Arthur* v. *Rheims*, id. 143, is, that the specific designation of an article by a commercial name will prevail over a general term in a later act, and has no application to the present case, which is not, as to cotton laces and cotton insertings, one of designation by a commercial name.

The bill of exceptions in the present case states that previously to about 1879 there were no cotton laces printed or dyed, and that from 1850 to 1861 there were many goods composed wholly of cotton, and bleached, printed, painted, colored, or dyed, such as calicoes (prints), lawns, handkerchiefs, velvets, and velveteens, and cotton piece-goods generally. If, when sect. 2 of the act of 1857 was enacted, the words " printed " and " painted " were not applicable to laces, it does not follow that the provision is to be limited to such cotton articles as

were then printed or painted as well as bleached or dyed. It includes any article which, as then known, satisfied any one of the conditions.

We see no warrant for the view that the act of 1857 applies only to piece goods.

It results from these views that the goods in question were subject to the duty imposed.

As to the three disputed fees, we are of opinion that they were none of them allowed by the law in force, sect. 2 of the act of March 2, 1799, c. 23.

The stamp or certificate on the invoice was one for the convenience and security of the collector and the government, and was not an "official certificate," in the sense of the statute. It was not an official document required by the merchant, nor was it given to him. It was a memorandum between officers in the custom-house, as a part of their system of checks and authentications.

The fee for the oath to the entry, as a fee for its administration, was not named in the statute. As a fee for the jurat to the oath, although the oath was required by the statute, and its form was prescribed, and it was to be taken before the collector, the jurat was not an official document required by the merchant or given to him.

The bill of exceptions states that the order to the storekeeper to deliver examined packages was an order required by the plaintiffs' firm from the collector. But we do not think it was an official certificate, or an official document required by the merchant, in the sense of the statute. The permit to land the goods having been issued and paid for, and the duties paid or secured, it was the duty of the officers of the customs to deliver the goods, when examined. The order to the storekeeper was a memorandum between officers. It was "required" by the merchant, in one sense, because, without it, according to the course of business, the storekeeper would not deliver the examined packages, but it was not an official document passing from the custom-house to the merchant.

*Judgment affirmed.*