# CADWALADER v. ZEH.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

No. 106. Argued November 23, 1893. — Decided January 8, 1894.

If words used in a statute imposing duties on imports had at the time of its passage a well-known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning must prevail, unless Congress has clearly manifested a contrary intention; and it is only when no commercial meaning is called for or proved, that the common meaning is to be adopted.

The question whether small earthenware cups, saucers, mugs and plates, having on them letters of the alphabet and figures of animals or the like, are "toys," within the meaning of Schedule N, and not "earthenware," within Schedule B, of the act of March 3, 1883, c. 121, depends upon the commercial meaning of the word "toys," if that differs from the ordinary meaning.

THIS was an action, begun May 22, 1888, against the collector of the port of Philadelphia, to recover an excess of duties paid under protest upon four lots of earthenware, consisting of small cups, saucers and mugs, and plates five or six inches in diameter, having upon them pictures of animals and of other objects, and letters of the alphabet, imported by the plaintiffs during the winter of 1887–88, invoiced as toys, and which the plaintiffs contended should have been assessed under the clause in Schedule N in the tariff act of March 3, 1883, c. 121, "dolls and toys, thirty-five per centum *ad valorem;*" but which the collector assessed under Schedule B of that act, imposing a duty on "china, porcelain, parian and bisque, earthen, stone and crockery ware, including plaques, ornaments, charms, vases and statuettes, painted, printed or gilded, or otherwise decorated or ornamented in any manner, sixty per centum *ad valorem*." 22 Stat. 495, 512.

At the trial, one of the plaintiffs and many other importers and sellers of china and earthenware, and of toys and fancy goods, in Philadelphia, called as witnesses for the plaintiffs,

testified that there was a class of goods in their business, made of earthenware, and consisting of cups, saucers, mugs and plates, commercially known and designated, bought and sold, as toys; that the articles in question (samples of which were produced by the plaintiffs) belonged to that class, were sold at six dollars a gross or fifty cents a dozen, and were intended for children to play with, although they could be, and sometimes were, used by children to drink or eat from.

The defendant called as witnesses two dealers in china and earthenware, who had been appraisers in the custom-house, and many manufacturers of earthenware at Trenton in the State of New Jersey, all of whom testified that there was a class of earthenware goods known in the trade as toys, but that the articles in question did not come within that class, because they were not small enough, and were fit for practical use; and some of whom testified that they were commonly bought and sold as cups, saucers, plates and mugs.

The defendant offered to prove by one of these witnesses that just before the trial he called at the toy-shop of Schwarz in Philadelphia, and asked for toy ware like the articles in question, was told that they did not keep such articles, and was shown tea sets of a smaller size. And he offered to prove by another of the witnesses that about the same time he called at John Wanamaker's establishment in Philadelphia, and, upon inquiry at the toy department thereof, was informed that the articles in question were not sold in that department as toys, but were to be found in the regular china or crockery department, and that he thereupon went to that department, and was shown such articles. The court excluded this evidence, and the defendant excepted to its exclusion.

The only other witness for the defendant testified, without objection by the plaintiffs, that he had been for two years in Mr. Wanamaker's employ as assistant manager of the crockery, china and glass department; that he knew the articles in question in his business; that they were known to the trade as plates, cups, saucers and mugs, and were sold as child's sets, and their principal use was to eat and drink from; that the business in his department was not large in those articles; and

that he knew nothing about a toy department in Mr. Wanamaker's establishment, except by passing through it.

The defendant requested the court to give to the jury the following instructions:

"1st. If you believe that the goods in question are bought, sold and used as earthen, stone or crockery ware, and not as toys, then your verdict should be for the defendant.

"2d. If you believe that the articles in question on March 3, 1883, and prior thereto, were commercially known and designated as earthenware, and if you believe that they were not at that time described and designated as toys, then it is immaterial how they have since been known and designated, and your verdict should be for the defendant.

"3d. If you believe that the articles in question are known as earthenware in the trade, and are chiefly used as other articles of earthenware, stone and crockery ware are used, and are not chiefly used as playthings for children, then your verdict should be for the defendant.

"4th. The circumstance that the articles in question may possibly be used for purposes other than household purposes is not controlling, and, even if you believe that sometimes they are incidentally used by children as playthings, your verdict should be for the defendant if you believe that their chief use is for household purposes and that they are not known as toys in the trade.

"5th. If you find that there is no trade designation of these articles as toys, then the question becomes purely and simply one of fact, viz.: what is the predominating use to which these articles are devoted, and if you believe that they are not chiefly used as playthings for children, then your verdict should be for the defendant.

"6th. If you believe that the articles in question are bought and sold under the names of a cup, saucer and plate, and not under the name of toys, then your verdict should be for the defendant.

"7th. A 'toy' is an article used exclusively for the amusement of children; and if you believe that the articles in question are chiefly used by children otherwise than as playthings, then

they are not toys within the meaning of the tariff act, and your verdict should be for the defendant; provided the word 'toys' has no special trade meaning.

"8th. Upon the evidence in this case, the term 'toys' should not be given any technical or particular or commercial meaning, but should receive its proper signification and natural import; and if the articles in question are not 'toys' in the popular and general sense of the term, but are used for ordinary household purposes, like other articles of earthenware, and if such use is predominating, and not exceptional, then your verdict should be for the defendant."

The court gave all those instructions, except the third; declined to give the third, because "if they were denominated toys by the trade at that time, then it is unimportant how they were used;" and instructed the jury that all the subsequent instructions were predicated upon the idea that the jury "do not find this term 'toy' to have a trade signification." To this instruction, as well as to the refusal to give the third instruction requested, the defendant excepted.

The court further instructed the jury that the signification of the term "toys," in common speech, embraces only such things as are primarily intended for the entertainment and amusement of children; that "the term 'toys,' used in the statute, is to receive the signification ordinarily attributed to it in common speech, unless the evidence shows that it has a different trade signification, that is, that it is differently used and understood when applied to such merchandise by those engaged in commerce respecting it, and had such different signification at the date of the statute in 1883;" that, if it had such different signification in trade and commerce, the statute must be understood as using the term in that sense; that the evidence seemed to put beyond doubt that the term had a well understood trade signification, inasmuch as the witnesses on both sides testified that at and before the date of the statute it was in common use among those engaged in this branch of commerce, and differed only as respected the scope of its application; and concluded the instructions to the jury as follows: "If you find that the term in question has a well

known trade signification, (had at the date of the statute,) and that these articles fall within it, your verdict must be for the plaintiff, no matter whether the trade designation seems to you to be reasonable or not. If you do not so find, your verdict must be for the defendant."

To those passages of the instructions given, which are above printed in quotation marks, the defendant excepted, and, after verdict and judgment for the plaintiff, sued out this writ of error.

*Mr. Assistant Attorney General Whitney* for plaintiff in error.

*Mr. Frank P. Prichard* for defendant in error.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

The question in this case is whether four invoices of small earthenware cups, saucers, mugs and plates, having upon them letters of the alphabet and figures of animals or the like, are to be classed, under the tariff act of 1883, as " toys," subject to a duty of thirty-five per cent, or as " earthenware, decorated or ornamented in any manner," subject to a duty of sixty-five per cent *ad valorem.*

The jury were instructed that the word " toys," in common speech, means playthings for children; that the word was to have that meaning in this case, unless the evidence showed that at the time of the passage of the tariff act it had a different trade signification, that is, that it was differently used and understood when applied to such merchandise by those engaged in commerce respecting it; and that, if it then had a well known trade signification, the statute must be understood as using it in that sense. The principal exception of the defendant is to this last instruction. The words " trade" and " commerce " were evidently used, throughout the instructions requested and those given, as including both domestic and foreign traffic in this country.

The instruction excepted to was in accordance with the uniform current of decision in this court. It has long been a settled rule of interpretation of the statutes imposing duties on imports, that if words used therein to designate particular kinds or classes of goods have a well known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention; and that it is only when no commercial meaning is called for or proved, that the common meaning of the words is to be adopted. *United States* v. *Chests of Tea*, 9 Wheat. 430, 438; *Tyng* v. *Grinnell*, 92 U. S. 467; *Arthur* v. *Butterfield*, 125 U. S. 70; *Robertson* v. *Salomon*, 130 U. S. 412, 415; *American Net & Twine Co.* v. *Worthington*, 141 U. S. 468; *Toplitz* v. *Hedden*, 146 U. S. 252; *Nix* v. *Hedden*, 149 U. S. 304. Among the words to which this rule has been applied are "refined sugar," *Barlow* v. *United States*, 7 Pet. 404; "sugar" and "syrup," *United States* v. *Casks of Sugar*, 8 Pet. 277; "wool" and "worsted," *Elliott* v. *Swartwout*, 10 Pet. 137; "cotton bagging," *Curtis* v. *Martin*, 3 How. 106; "silk veils," *Arthur* v. *Morrison*, 96 U. S. 108; "bar iron," *Worthington* v. *Abbott*, 124 U. S. 434; "furniture finished," *Hedden* v. *Richards*, 149 U. S. 346.

None of the cases cited in behalf of the collector have any tendency to shake this rule; but all of them depended on special provisions of the statutes.

The case of *Maillard* v. *Lawrence*, 16 How. 251, which was much relied on, arose under the act of July 30, 1846, c. 74, imposing a duty of thirty per cent on "clothing ready made, and wearing apparel of every description, of whatever material composed, made up or manufactured wholly or in part by the tailor, sempstress or manufacturer;" and a duty of twenty-five per cent on "manufactures of silk, or of which silk shall be a component material," and on "manufactures of worsted, or of which worsted shall be a component material." 9 Stat. 45, 46. It was because of the peculiar language of the first of those clauses, making the designed object and actual use of the things the sole test, that this court, affirming the

judgment of the Circuit Court in 1 Blatchford, 504, held that the words "wearing apparel" must be given their natural and ordinary meaning, and that evidence that shawls of silk or of worsted were not known in trade and commerce as "wearing apparel" was not admissible to show that they were not included in that clause. In the Circuit Court, Mr. Justice Nelson said that "this phraseology, for the purpose of describing a dutiable article, was used for the first time in the act of 1846, and was introduced for the purpose of describing a class of articles, not as known in trade and commerce by any particular appellation, but by the actual use for which they were designed, and to which they were adapted, taken in connection with the fact that they were made up or manufactured wholly or in part by the tailor, sempstress, or manufacturer;" and that "Congress intended to depart from the commercial designation as the test to determine the description within which the duty should or should not be charged, and to leave such determination to the test of the actual use of the article." 1 Blatchford, 505. And Mr. Justice Daniel, in delivering the judgment of this court, said that it must be understood as being the intention of the legislature to comprise "every article which in its design and completion and received uses is an article of wearing apparel," "no matter of what material composed, either in whole or in part, or by whom composed or made up." 16 How. 260.

The decision in *De Forrest* v. *Lawrence*, 13 How. 274, was an application of the rule that where goods of a particular kind, which would otherwise be comprehended in a class described by a term having a settled commercial signification, have been described in the customs laws by a more specific designation and subjected to a distinct rate of duty from that imposed upon the class generally, they are taken out of that class for the purpose of the assessment of duties. See *Seeberger* v. *Cahn*, 137 U. S. 95, 98, and cases cited.

In *Greenleaf* v. *Goodrich*, 101 U. S. 278, and in *Schmieder* v. *Barney*, 113 U. S. 645, the extent of the decision was that the phrase "of similar description" was not a technical or commercial term; and that, while it might be competent to

ask merchants and importers what the words, in the act of July 14, 1862, c. 163, (12 Stat. 553,) "goods of similar description to delaines" were commercially understood to mean, they could not be asked whether in their opinion the goods in question were of similar description to delaines.

In *Barber* v. *Schell*, 107 U. S. 617, 621, the words held not to be affected by commercial usage were "all manufactures composed wholly of cotton, which are bleached, printed, painted or dyed." Act of March 3, 1857, c. 98, § 2; 11 Stat. 193. That designation, as observed by Mr. Justice Blatchford, speaking for this court, and following the decision of Mr. Justice Nelson in *Reimer* v. *Schell*, 4 Blatchford, 328, was a designation of articles by special description of quality or material, as contradistinguished from designation by a commercial name.

In *Newman* v. *Arthur*, 109 U. S. 132, the decision was that the clear meaning of the provisions of section 2504 of the Revised Statutes, fixing the rate of duty on manufactures of cotton by a classification based on the number of threads to the square inch, without reference to the mode of counting, could not be controlled by evidence as to what goods were usually bought and sold by the count of threads.

No reason is shown for taking the present case out of the general rule. The tariff act of 1883 contains nothing from which it can be inferred that the word "toys" is used therein in any other than its commercial meaning. At the trial the witnesses on both sides testified that there was a class of earthenware goods commonly known in trade and commerce as toys. They differed, indeed, upon the question whether these articles came within that class; the plaintiffs' witnesses testifying that they did, and the defendant's witnesses that they did not. But the comparative weight to be allowed to the different witnesses, or classes of witnesses, was a matter for the consideration of the jury. If the whole testimony in the case enabled the jury to determine whether the articles in question were commercially known as toys, their commercial designation by those carrying on the business of dealing in them was a safer test, and more in accord with the apparent

intent of Congress, and with the rule of construction judicially established in similar cases, than to leave the question, whether "toys" or "earthenware" was the fitter name for these articles, to be decided by the opinion of jurors, based upon their personal knowledge or experience. The jury having been distinctly instructed that if they found that there was no trade designation of these articles as toys, and that they were not chiefly used as playthings for children, the verdict should be for the defendant, the defendant has no just ground of exception to the instructions given, or to the refusal to instruct as requested.

The only other exception argued is to the exclusion of the testimony of two witnesses as to what each of them was told, upon inquiring for such articles, at a large toy-shop in Philadelphia just before the trial. This testimony was rightly excluded. Upon the question of the ordinary meaning of the word "toys," it was irrelevant. If such testimony could have been competent under any circumstances to prove a commercial meaning, (which we do not intimate,) it certainly had no tendency to prove what that meaning was at the time of the passage of the act of 1883.     *Judgment affirmed.*